Paul R. Rooney (PR-0333)
REED SMITH LLP
599 Lexington Avenue, 28th Floor
New York, New York 10022
(212) 521-5400

Attorneys for Defendant
Mellon Financial Corporation

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------X
RAYMOND VAN COTT                     : 07 Civ. 5578
                                     :
                Plaintiff,           : **AFFIDAVIT OF**
        - against -                  : **AUDREY F. BONNETT**
MELLON FINANCIAL CORPORATION         :
                                     :
                Defendant.           :
------------------------------------------------X

Commonwealth of Pennsylvania:    )
                                 )    SS:
County of Allegheny:             )

AUDREY F. BONNETT states under oath as follows:

    1.    I am the Program Manager for the Mellon Financial Corporation Displacement

Program ("Displacement Program"). I was Program Manager at all times relevant to matters

involved in the above-captioned lawsuit. The Displacement Program is an employee benefit plan

covered by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et. seq.*, as

amended.

    2.    Attachment 1 to this Affidavit is a true and correct copy of the Displacement

Program document/summary plan description.

    3.    Plaintiff applied for and was denied Displacement Program benefits, in

accordance with the Displacement Program's administrative procedures and applicable

Department of Labor regulations. On July 6, 2005, the Plaintiff filed a claim for benefits from

the Displacement Program. The Displacement Program denied his claim on October 3, 2005.

On October 18, 2005, Plaintiff appealed the denial of his claim for Displacement Program

benefits. On February 15, 2006, the Displacement Program denied his appeal. The Displacement Program did not find the Plaintiff "displaced," as that term is defined by the Program, as a direct result of the sale of HR&IS to Affiliated Computer Services ("ACS"). Attachment 2 to this Affidavit is the final determination of the Program.

4.    In December 2004, prior to the sale of Mellon HR Solutions, LLC to Affiliated Computer Services, Plaintiff was provided notice of his potential right to become eligible for enhanced severance benefits, a.k.a. Transition Package. To be eligible for such benefits, one had to be found to be "displaced" under the Displacement Program pursuant to its terms and procedures. Attachment 3 is a copy of the December 2004 notice provided to the Plaintiff.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed on this ___5th___ day of June, 2007.

                                                    _Audrey F. Bennett_
                                                    Audrey F. Bennett

Subscribed to and sworn
before me this _15th_ day of
June, 2007.

_Diane M. Wagner_
Notary Public

My Commission Expires: _March 5, 2009_

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Diane M. Wagner, Notary Public
City of Pittsburgh, Allegheny County
My Commission Expires Mar. 5, 2009
Member, Pennsylvania Association of Notaries

# ATTACHMENT "1"

# MELLON FINANCIAL CORPORATION

## DISPLACEMENT PROGRAM
## SUMMARY PLAN DESCRIPTION

**January 1, 2005**

# CONTENTS

Page

Administrative Information ............................................................................................. 1

Eligibility and Benefits ................................................................................................. 1
   —Eligibility Requirements ......................................................................................... 1
   —Notification of Eligibility ....................................................................................... 3
   —Displacement Pay Components ............................................................................. 3
      —Basic Displacement Pay ...................................................................................... 3
      —Extended Displacement Pay ................................................................................. 3
      —Maximum Total Displacement Pay ......................................................................... 4
      —Base Salary ........................................................................................................ 4
   —Continuous Service ............................................................................................... 4
      —General Rule ..................................................................................................... 4
      —Full Years ......................................................................................................... 4
      —Bridging Service ................................................................................................ 4
      —Service with Prior Employer ................................................................................. 5
   —Displacement Payment Method ............................................................................. 5
      —Preamble ......................................................................................................... 5
      —Salary Continuance ............................................................................................ 5
      —Lump-Sum Payment ........................................................................................... 6
      —Special Delayed Benefit Commencement Date ......................................................... 6
      —Supplemental Unemployment Benefit Payments ....................................................... 6
   —Notification of Employment .................................................................................... 8
   —Temporary Assignments ........................................................................................ 8
   —Career Transition Assistance ................................................................................. 8
   —Career Opportunities Program ............................................................................... 9
   —Offset of Benefits by Incentive Benefits .................................................................. 9
   —Correction of Errors ............................................................................................. 9

Salary Administration .................................................................................................. 10
   —Employment Status ............................................................................................. 10
   —Merit Increases .................................................................................................. 10
   —Temporary Assignments ...................................................................................... 10
   —Lower Salary Grade Jobs ..................................................................................... 10
   —Re-Employment .................................................................................................. 10
   —Death ............................................................................................................... 11

Benefits .................................................................................................................... 11
   —Benefit Program ................................................................................................. 11
   —Mellon Bank 401(k) Retirement Savings Plan (401(k) Plan) ...................................... 11
   —Mellon Bank Retirement Plan ................................................................................ 11
   —COBRA ............................................................................................................. 11
   —Life Insurance .................................................................................................... 11
   —Disability/Workers' Compensation ......................................................................... 12
   —Relocation and Tuition Assistance ......................................................................... 12
   —Vacation ............................................................................................................ 12
   —Personal Leave of Absence ................................................................................... 13
   —Club Memberships .............................................................................................. 13
   —ShareSuccess Plan .............................................................................................. 13
   —Employee Stock Purchase Plan (ESPP) ................................................................... 13
   —Profit Bonus Plan, Restricted Stock Grants, Stock Options and Other Incentive Plans ..... 13
   —Automobile ....................................................................................................... 13
   —Additional Information ......................................................................................... 13

Amendment or Termination of the Program.............................................................. 13

    —Effect of Conflicting Provisions ................................................................ 14

Unemployment Compensation .......................................................................................... 14

Claim and Appeal Procedures........................................................................................... 14

Additional Facts About the Plan ..................................................................................... 16

ERISA Rights Statement ................................................................................................... 17

## ADMINISTRATIVE INFORMATION

The Mellon Financial Corporation Displacement Program (the "Program") provides displacement payments and certain benefit coverages to eligible employees displaced from their jobs for business reasons not related to individual performance. The Program is provided voluntarily by Mellon Financial Corporation and is not based on any consideration for services rendered in the past or in the future. The Program is subject to revision or termination at Mellon Financial Corporation's discretion at any time.

The Program Manager is responsible for day-to-day administration of the Program, including, by way of example, determining eligibility, amount and duration of all Program benefits.

You may obtain additional information regarding the Program by contacting the Manager, Corporate Displacement Plan, Mellon Bank, N.A., Two Mellon Bank Center, Room 152-1025, Pittsburgh, PA 15259-0001.

**This is both the Program Document and Summary Plan Description of the Program. You are receiving this combined Program Document and Summary Plan Description ("Program Document") as required by the Employee Retirement Income Security Act of 1974 (ERISA). Please keep this booklet for your reference.**

**The terms and conditions of the Program as set forth in this Program Document apply to eligible employees whose Displacement Date is on or after January 1, 2005. The Program Document as in effect prior to January 1, 2005 shall continue to govern the terms and conditions under which Program benefits are provided to eligible employees whose Displacement Date occurs prior to January 1, 2005.**

## ELIGIBILITY AND BENEFITS

**ELIGIBILITY REQUIREMENTS**
You are eligible to begin participation if you are a benefited full-time or a benefited part-time employee of either Mellon Financial Corporation ("Mellon") or any of its 80% or more owned subsidiary or affiliated companies which has expressly elected to have its eligible employees covered by this Program (each a "Participating Mellon Company"). You are eligible to receive benefits (displacement payments and certain benefit coverage) if your employment ceases due to technological change or another business reason not related to individual performance.

An employee is <u>not eligible</u> to receive benefits under the Program in the following cases:

- When the employee ceases to be "benefited"

- When the employee voluntarily resigns from any Mellon position; including, by way of clarification and not limitation, a voluntary resignation from any Mellon position accepted by an employee who otherwise would have been entitled to displacement benefits under this Program; and without regard to whether the employee ever reported to work at the new position and/or whether the resignation occurs before or after the employee's Official displacement effective

date.

- When the employee is covered by a separate agreement (either covering the employee individually or as a result of covering a group of employees which includes the employee) that provides compensation and/or benefits for periods following the employee's termination of employment ("**Separate Agreement**"), except where the Separate Agreement expressly provides that the employee shall remain eligible for benefits under this Program.

- When the employee's employment with a Participating Mellon Company is affected by Mellon's sale of a business or by Mellon's contracting for or otherwise transferring the employee's employment functions to another employer where the terms of the sale, contract or transfer provide for employment of the employee by another employer and Mellon determines (such determination being made in Mellon's sole discretion) that the position to be provided to the affected employee:

  – does not involve a significant change in responsibilities from those assigned to the employee immediately prior to the sale or transfer;

  – unless otherwise provided in the terms of the sale, contract or transfer, is at a location within a thirty (30) mile radius of the employee's location immediately prior to the sale or transfer; or

  – initially provides base salary and incentive compensation opportunities which, in the aggregate, are reasonably similar to those provided by the Participating Mellon Company immediately prior to the sale or transfer

  For purposes of this exception, "**Incentive Compensation**" means any bonus, incentive or commission opportunities (regardless of whether based on individual and/or market performance or whether the award is determined by formula or by management discretion); provided, however, that incentive compensation shall not include the value of awards of options to purchase Mellon stock; any special "retention bonuses" established in connection with Mellon's sale of a business or Mellon's contracting for or otherwise transferring the employee's employment functions to another employer; nor shall it include Premier Achievement or any other miscellaneous forms of additional compensation not specifically included within the terms "bonus" and "commission" as defined by Mellon.

- When the employee declines Mellon's offer of employment in a position within one salary grade below the position from which the employee is being displaced and Mellon determines (such determination being made in Mellon's sole discretion) that the lower salary grade position offered:

  – does not involve a significant change in responsibility;

  – does not require transferring to a location beyond a thirty (30) mile radius of the employee's location immediately prior to the displacement; provided, however, that Mellon, in its sole discretion, may expand or contract the thirty (30) mile guideline to take into account the presence or absence of public transportation or infrastructure impediments which positively or negatively affect employee commuting burdens;

  – does not impose an unreasonable change in hours of work;

  – with respect to employees whose prior position included incentive opportunities, would not involve more than a 15% reduction in the total cash

compensation opportunities initially available to the employee; and

— is otherwise consistent with the employee's skills, training, and work experience.

• When the employee affirmatively elects to apply for a specific position, without regard to whether the position was identified through the Career Opportunities or similar job posting Program available to existing Mellon employees or through the employee's own efforts, and Mellon determines that:

— the employee was offered the position for which she/he applied; and

— the employee declined to accept the offered position.

• When the employee voluntarily elects to participate in a voluntary early retirement incentive program providing retiree medical and/or enhanced retirement benefits and the value of the retiree medical and/or enhanced retirement benefits equal or exceed the displacement pay that would otherwise be provided under this Program.

• When the employee has not been actively at work for more than 26 weeks on account of an illness or injury which Mellon determines (such determination being made in Mellon's sole discretion) will, but for the satisfaction of any applicable waiting periods and/or application requirements, entitled the employee to commence receipt of long-term disability payments.

**NOTIFICATION OF ELIGIBILITY**

Eligible employees will be notified in writing of their official displacement effective date, the amount of displacement pay to which they are entitled, payment options, benefit coverage continuation, and career transition assistance availability. Such written communication constitutes formal notification under the Program and will be given two weeks in advance of the official displacement effective date if business needs, as determined by Mellon in its sole discretion, permit. Oral communications or written estimates of possible benefits do not constitute formal notification under this Program. Mellon, in its discretion, may provide two week's pay in lieu of notice.

*Note: Mellon complies with any applicable legislation requiring employers to give notification of layoffs, site closings, force reductions, etc., in accordance with such legislation.*

**DISPLACEMENT PAY COMPONENTS**

**Basic Displacement Pay** — Displaced employees who meet the eligibility requirements of the Program will receive basic displacement pay equal to two weeks of "base salary" (defined below) for each full and/or partial year of "continuous service" (defined below) with a Participating Mellon Company immediately prior to their official displacement effective date, up to a maximum amount equal to one year's base salary.

**Extended Displacement Pay** — Extended displacement payments based on the following criteria will be made to eligible displaced employees receiving benefits under the salary continuance payment option **and have not commenced other employment** prior to the exhaustion of their weeks of basic displacement pay:

- 4 weeks' base salary for employees in non-exempt salary grades B through E and non-exempt employees not on a Corporate salary grade structure;

- 8 weeks' base salary, for employees in non-exempt salary grades F and above and exempt salary grades 2 through 6 and exempt employees who are not on the Corporate salary grade structure and whose annual base salary is $45,000 or less; and

- 12 weeks' base salary, for employees in exempt salary grade 7 and above and exempt employees who are not on the Corporate salary grade structure and whose annual base salary exceeds $45,000.

**Maximum Total Displacement Pay** — Total displacement pay (basic displacement pay and extended displacement pay) will not exceed one year's base salary. All displacement payments will be treated as taxable compensation and shall be subject to all applicable federal, state and local taxes and withholding requirements.

**Base Salary** — As calculated for purposes of this Program "base salary" means the employee's annual base salary, wage or "benefits base" rate (for employees on commission plans) exclusive of all special adjustments or increments such as shift differentials, over-time, incentive compensation, and the cash value of any and all non cash benefits as in effect immediately prior to his displacement date payable in 24 equal amounts over Mellon's regular semi-monthly payroll periods.

**CONTINUOUS SERVICE**

**General Rule** — As calculated for purposes of this Program "continuous service" begins on the date the employee first performs an hour of compensable work (the employee's "**anniversary date**") as a benefited full-time or a benefited part-time employee for a Participating Mellon Company and ends on the earliest to occur of the employee's ceasing to be benefited, quit, retirement, displacement, discharge, death or other termination of employment (referred to as a "**break in service**"). Hours of compensable work performed by an employee prior to becoming a benefited full-time or a benefited part-time employee are not counted as "continuous service".

**Full Years** — All eligible employees with less than twelve (12) months of continuous service (measured from each employee's anniversary date) are treated as having one (1) year of continuous service for purposes of determining their benefits under the Program. Employees with twelve (12) or more months of continuous service shall have their period of continuous service under the Program rounded up to the next full year.

**Bridging Service** — Except as otherwise provided in the following sentence, former employees who are rehired (or become benefited) following their earlier break in service shall lose all prior periods of Continuous Service and shall be treated as a new employee. Rehired employees (or those who resume benefited status) whose break in service occurred after January 1, 1993 and who are rehired (resume benefited status) less than one (1) year from the date of their earlier break in service shall have their prior period(s) of continuous service restored and shall be treated as if the period of their break in service was continuous service (referred to as "service spanning"). In other words, employees described in the preceding sentence who leave a Participating Mellon Company (or cease to be benefited) and return ( or resume benefited status) in less than one (1) year are treated as if they never left under this Program.

**Service with Prior Employer** — Where a person becomes a Mellon employee as a

result of Mellon's acquisition of person's prior employer, through merger, a stock or asset acquisition, or otherwise, such person's service with the prior employer before it became part of Mellon will **not** automatically be treated as continuous service for purposes of determining the person's future benefits, if any, under the Program. Rather, unless there is express language in the governing merger/acquisition agreement, or in the related documentation implementing the benefits portion of the acquisition, providing for the crediting of prior service for purposes of calculating displacement/severance benefits, service with an employer prior to becoming part of Mellon is **not** counted.

Notwithstanding this general rule that service with a prior employer is not counted, if a person is employed either by these banks which, after their acquisition by Mellon were commonly referred to as Mellon (North), Mellon (Northeast), Mellon (Central), Mellon (Commonwealth) or Mellon (Girard) or by these entities which after their acquisition by Mellon, were commonly referred to as Meritor I or PSFS, then the employee's service with any of these prior employers as a "benefited" (or equivalent status) employee will be taken into account for purposes of determining Continuous Service under this Program as well as for purposes of determining years of service for vacation entitlement and Short Term Disability eligibility.

**DISPLACEMENT PAYMENT METHOD**

**Preamble** — The October 22, 2004 passage of the American Jobs Creation Act of 2004 (H.R. 4250) imposed new restrictions on non-qualified plans, such as this Program, which permitted participants to elect between a lump sum or an installment form of payment. Accordingly, all employees with an official displacement effective date on or after January 1, 2005 will receive Program benefits solely in the form of Salary Continuance. Moreover, any displaced employee considered a "Key Employee" under the Act (generally defined as one of the top-50 highest paid officers earning over $130,000 (as adjusted)) may not commence receipt of Program benefits until the expiration of a six month waiting period commencing on the official displacement effective date.

**Salary Continuance** — The employee receives basic displacement pay in periodic installments of base salary on regular pay days. If the employee becomes eligible for extended displacement pay, that is also paid in periodic installments on regular paydays. The initial and/or final salary confirmation payment will be pro-rated where the number of weeks of basic and extended salary continuance to which the employee is entitled does not correspond exactly to the start and/or end dates of the related regular payroll periods.

Benefit coverage continues as discussed below while the employee is receiving salary continuance. In the event the employee: (i) commences other new employment; or (ii) elects to commence their benefits under any Mellon retirement plan, then periodic installments cease and, except with respect to: (x) re-employment by Mellon; or (y) employment or other activity in violation of any restrictions on competition or solicitation set forth in a Separate Agreement (defined above), the unpaid balance, if any, of basic displacement pay is paid in a lump sum. No lump-sum payment of unused extended displacement pay is made.

No lump sum payments of unused basic or extended displacement pay is made with respect to displaced employees: (i) rehired by Mellon; or (ii) who violate the terms of any restrictions on competition or solicitation set forth in a Separate Agreement. Any lump sum payment required by this paragraph will be made within 30 days of

the event requiring the payment.

**Lump-Sum Payment** —Solely for purposes of calculating the dollar amount of any such lump sum payment, the employee's annual base salary (defined above) otherwise payable over 24 semi-monthly payroll periods shall be converted into a weekly base salary amount by <u>dividing the annual base salary by 52</u>. The weekly amount thus determined will be multiplied by the number of whole or partial weeks of basic displacement pay remaining from the employee's original entitlement to determine the amount of lump sum payment to pay off the employee's unpaid balance.

**Special Delayed Benefit Commencement Date** — Notwithstanding the payment dates described above, the Salary Continuance benefits otherwise payable to a displaced employee determined by Mellon to be a "Key Employee" within the meaning of the American Jobs Creation Act of 2004 shall not commence until the first regular payroll period beginning after the expiration of the six month period commencing on such Key Employee's official displacement effective date.

**Supplemental Unemployment Benefit Payments** — An employee whose Program benefits are paid in the form of salary continuance payments may be eligible to receive these payments under the Mellon Financial Corporation Supplemental Unemployment Benefit (SUB) Program. Under the SUB Program, salary continuance payments are made on a "pre-tax" basis (note that an employee may receive salary continuance payments and benefits under either this Displacement Program or under the SUB Program, but <u>not</u> under both). This means that an employee would pay no Social Security taxes, unemployment taxes, and in some states, state income taxes on the salary continuance payments.

*Who is Eligible for SUB Payments:* Generally, an employee who is available for work, who has not commenced new employment and who is eligible to receive state unemployment benefits will be eligible to receive salary continuance payments under the SUB Program instead of payments under this Displacement Program. Further, in certain circumstances, an employee may be eligible to receive SUB Program payments even if the employee is not eligible for state unemployment benefits. For example, an employee who is not eligible to receive state unemployment benefits for any of the following reasons may nevertheless be eligible for SUB Program payments:

- The employee has not satisfied an applicable waiting period for state unemployment compensation benefits;
- The employee did not earn enough to qualify for state unemployment compensation benefits;
- The employee has exhausted state unemployment benefits; or
- The employee chose not to apply for unemployment benefits despite being eligible for such benefits.

However, the specific eligibility requirements for and the specific provisions regarding the payment of salary continuance payments under the SUB Program in substitution for salary continuance payments under this Displacement Program are described in the separate summary plan description for the SUB Program.

**NOTIFICATION OF EMPLOYMENT**

Displaced employees receiving salary continuance payments must notify the Program Manager as soon as possible, but in no event later than three (3) work days, of their beginning "new" employment with another employer. Except with respect to re-employment by Mellon, such notification will not affect the displaced employees' right to receive any unpaid installments of basic displacement pay in one lump sum. However, failure to promptly notify the Program Manager of the start of other employment may cause the displaced employee to erroneously receive excess extended displacement payments and/or benefits which will have to be repaid to Mellon.

As noted above, no lump sum payments of unpaid installments of basic or extended displacement pay are made with respect to displaced employees re-hired by Mellon.

For purposes of this Displacement Program, "new" employment means full or part-time employment which commences after the employees receipt of their official notification of their Displacement Date.

**TEMPORARY ASSIGNMENTS**

Displaced employees with a fully satisfactory "On Target" rating or better or with a "Too New to Rate" Performance Appraisal rating may be offered temporary assignments within Mellon; provided that any such temporary assignment is for the same base salary and hours of work as the job from which the employee is being displaced. Salary continuance is suspended when a displaced employee begins such a temporary assignment. Base salary is paid and employee benefit coverage is continued, with the exception of vacation accrual, while the employee is performing the temporary assignment. Declining or terminating such a temporary assignment will not result in loss of eligibility for displacement pay or continuation of certain employee benefit coverages.

A "temporary assignment" is one of at least 2 weeks but not more than 6 months. Regardless of the duration of any separate temporary assignment, in no event may the aggregate of separate periods of temporary assignment offered to Displaced Employees exceed six months

Although time spent on temporary assignment is not treated as continuous service (see below), neither does it reduce previously earned but unpaid salary continuance payments. Accordingly, effective as of the conclusion of their temporary assignment, employees will be provided with a notice of the resumption of their remaining salary continuance payments and their revised displacement end date.

Except as may be required by the Bridging of Service rules (discussed above) with respect to displaced employees who are rehired following a temporary assignment, time worked in a temporary assignment will **not** be treated as "continuous service" for purposes of determining the basic displacement pay to which the employee is entitled under this Program.

**CAREER TRANSITION ASSISTANCE**

Career transition assistance is offered to displaced employees.

The type and scope of the career transition assistance program, as well as the provider of any such career transition assistance, will be determined by the Program Manager, in the Manager's sole discretion, at the time of any particular employee's

displacement. Regardless of the type and scope of career transition assistance provided, however, in no event shall Mellon provide or be responsible for any costs or expenses incurred by the employee in the employee's search for new employment; including, but not limited to, travel, lodging and meal expenses.

All contact with career transition providers will be made through the Program Manager. Employees may elect not to participate in the career transition assistance which is offered. However, payment of career transition fees to employees in lieu of career transition services is not permitted.

**CAREER OPPORTUNITIES PROGRAM**

Displaced employees are eligible to apply for positions posted in the Career Opportunities Program while they are receiving salary continuance, provided they meet the posting requirements of the Career Opportunities Program.

**OFFSET OF BENEFITS BY INCENTIVE BENEFITS**

Like most displacement benefit plans, the benefits provided under the Program are intended to help displaced employees "bridge the gap" between periods of employment or retirement income. Special early retirement incentive programs offering retiree medical benefits and/or enhanced retirement benefits during a limited election or "window" period ("Incentive Benefits") are also designed to bridge this same gap.

Because of this overlap, subject to any contrary legal requirements where a displaced employee is eligible to receive (or is receiving) benefits under the Program and voluntarily elects to receive an Incentive Benefit provided by a Participating Mellon Company ("Mellon Incentive Benefits"), the displacement pay to which the displaced employee would otherwise have been entitled under the Program, but for the election of the Mellon Incentive Benefits, will be offset by the value of the Mellon Incentive Benefits.

With respect to any displaced employee who was already receiving salary continuation payments under the Program at the time of an election to take the Mellon Incentive Benefits, the offset would only apply to salary continuation benefits, if any, which would otherwise become payable after the effective date of the election of the Mellon Incentive Benefit.

Where the value of the Mellon Incentive Benefit fully offsets the displacement pay which would otherwise be provided under the Program, the displaced employee will be considered to have terminated employment as of the effective date of the Mellon Incentive Benefits and the displaced employee would not be entitled to continued benefit coverage or any other Program benefit.

The offset would not apply to displaced employees who do not elect a Mellon Incentive Benefit.

**CORRECTION OF ERRORS**

The Program Manager strives to operate the Program as accurately as possible. Occasionally, however, errors in determining initial eligibility and/or calculation of displacement pay and benefits will occur. In such situations, Mellon expressly reserves the right to correct any and all errors; including, by way of example, the right to demand repayment of any excess displacement payments erroneously made to a displaced employee due to miscalculations of base salary as well as the authority to adjust the number of weeks of basic and/or extended displacement pay being provided to a displaced employee to correct miscalculations of continuous

service. Any past failure to detect and/or correct any error in the operation of the Program shall not prevent or otherwise restrict the Program Manager from correcting any future error.

## SALARY ADMINISTRATION

**Employment Status** — Except as otherwise provided in any Separate Agreement (defined above), displaced employees receiving salary continuance shall be described, for payroll purposes, as "terminated with pay" but shall continue to be treated as a Mellon employee, solely for purposes of the various benefit coverages provided under the Program, until the date which is the earlier of: the date they commence employment with a new employer; or the last day for which the employee is entitled to salary continuance payments from the Program. On or after such termination date, the displaced employee shall be entitled to elect those benefits, if any, provided to terminated Mellon employees.

Except as otherwise provided in this Program Document, in the document or policy setting forth the terms and conditions of any particular employee benefit or in any Separate Agreement (described above), displaced employees shall be treated as active employees with respect to any pension, welfare, fringe or other employee benefit provided to the displaced employee receiving salary continuance payments under this Program without regard to whether such displaced employee is performing any services for Mellon.

Employees who receive a lump sum payment of basic displacement pay on account of their accepting new employment or retirement from Mellon shall have their employment with Mellon terminated for all purposes effective as of their re-employment or retirement date, as applicable.

**Merit Increases** — Employees who are displaced are not eligible to receive a merit increase with an effective date subsequent to their official displacement effective date.

**Temporary Assignments** — While on temporary assignments, employees do not receive merit or promotion increases. If an employee on temporary assignment subsequently accepts a job within Mellon, time worked in a temporary assignment will be used in determining the timing of the next merit increase; such increases are not retroactive.

**Lower Salary Grade Jobs** — The Salaries ("Prior Salaries") of displaced employees who accept jobs with a lower salary grade than the salary grade of the position from which they were displaced will be reduced to the maximum salary for the new job if their Prior Salary was more than the maximum of the salary range of the new job. If a salary reduction is to occur, the employee will be notified when the job is offered and the reduction will become effective as soon as possible but in no event later than the end of the six month period following the start of the new job.

**Re-Employment** — Displaced employees who apply for re-employment by Mellon after they have received a lump-sum payment of basic displacement pay on account of their accepting employment with a non-Mellon employer or their retirement from Mellon will only be offered new employment with Mellon if they agree to repay the portion of the lump sum (if any) that represents the difference between: (i) the number of weeks of earned displacement pay represented by the lump sum payment; and (ii) the number of weeks between the employment or retirement date triggering the lump sum payment of unpaid basic displacement pay and the effective date of re-employment.

Whether or not rehired former employees shall be recredited with their period(s) of

prior continuous service for purposes of this Program shall be determined in accordance with the general rules set forth in the earlier section of this Program document entitled "Continuous Service". Former employees who are rehired at any location under circumstances that entitle them to have their prior continuous service restored and their period of absence treated as continuous service under the service spanning rule will receive similar service credit for purposes of determining their subsequent annual vacation entitlement and Short-Term Disability eligibility.

Displaced employees who are re-employed in the same calendar plan year must enroll in the same flexible benefit program options in which they were enrolled when they were displaced. If they are re-employed in a subsequent calendar plan year, they will be treated as newly hired employees and will be eligible to select new benefits options.

**Death** — The estate of an employee who dies while receiving basic displacement pay in periodic installments shall be paid the unpaid balance, if any, of the deceased's employee's basic displacement pay benefit in one lump sum payment.

## BENEFITS

**Benefit Program** — Participation in certain of the benefits offered through the Mellon flexible benefit program will continue while the employee is receiving salary continuance. Mellon reserves the right to add to or subtract from the continued benefits from time to time and at any time. The benefits to be continued with respect to any particular displaced employee will be described in the official notification letter provided to the employee. At the time this document was drafted, the following benefits were to be continued to employees receiving salary continuance: medical, dental, life insurance and health and dependent care funds.

**Mellon Bank 401(k) Retirement Savings Plan (401(k) Plan)** — Employees receiving salary continuance will continue to be eligible to participate in the 401(k) Plan.

**Mellon Bank Retirement Plan** — Employees receiving salary continuance will continue to receive credit for vesting purposes and benefit calculation in the Mellon Bank Retirement Plan while receiving such payments.

**COBRA** — Effective as of their termination date described in the section entitled "Employment Status", employees covered by a Mellon group health plan may elect to have such coverage continued under a federal law commonly referred to as "COBRA". Under COBRA, employees are eligible to elect to continue their Mellon medical plan and dental plan coverage for up to 18 months. A spouse or dependent child of an employee who loses coverage under the Mellon medical or dental plan may be eligible to continue coverage for up to 36 months.

**Life Insurance** — Effective as of their termination date described in the section entitled "Employment Status", employees covered by a Mellon group term life insurance plan may elect to convert such coverage into an individually owned policy.

*For more information regarding COBRA continuation coverage or the right to elect individual life insurance, please refer to the COBRA and conversion rights sections in the Medical Plan and Life Insurance Plan Summary Plan Descriptions or contact*

*the Human Resources Customer Service Center (1-800-947-HR4U (4748)).*

**Disability/Workers' Compensation** — Employees will not be displaced while receiving Short-Term Disability benefits or workers' compensation benefits. If such employees are able to return to work within twenty-six (26) weeks of the commencement of their absence, but their jobs were eliminated during their absence, they will be notified of their displacement on the date they would have returned to work and shall be provided with such Program benefits, if any, to which similarly situated employees who were not on short-term disability or receiving workers' compensation would be entitled on the same displacement date. If such employees' absence due to Short-Term Disability or Workers' Compensation exceeds twenty-six (26) weeks, they are not eligible to receive any benefits under the Program.

After their official displacement effective date, employees are not eligible for Short-Term or Long-Term Disability benefits.

**Relocation and Tuition Assistance** — All relocation allowances which are in effect on the official displacement effective date will remain in effect while the employee receives salary continuance. Domestic relocatees will not be relocated unless Mellon assigns them to a job in another location. U.S. employees displaced from a position in another country will be relocated back to their point of origin if they choose to relocate within 60 days of their official displacement effective date. Tuition reimbursements with respect to tuition assistance approved and classes registered prior to the official displacement effective date will be paid only in those situations where the request for reimbursement was submitted on or before the cut-off date for the preparation of the employee's final salary continuance payment.

**Vacation** — An Employee's annual vacation entitlement is based on years of Continuous Service. The annual vacation entitlement, in turn, is spread evenly over the entire calendar year so that, in effect, 1/12th of the annual entitlement is earned each month. Employees are not permitted to earn any portion of their annual vacation entitlement (nor purchase any additional vacation days under the Flexible Benefits Program) after their official displacement effective date nor while they are working in any temporary assignments. Vacation earned (or purchased under the Flexible Benefits Program) but unused in the calendar year of displacement is paid to displaced employees as soon as possible following their displacement. **To the extent a displaced employee has used more vacation days than were earned through the employee's displacement date, the employee's basic displacement pay (paid in a lump sum or in the initial salary continuance payment, as applicable) will be reduced by an amount equal to the value of the unearned vacation.**

For example, an Employee with an annual vacation entitlement of 4 weeks leaves on July 1. The Employee has "earned" 2 of the 4 weeks. If the Employee had taken less than 2 weeks, he would be paid the earned but unused amount. If the Employee had taken more than 2 weeks, the days taken in excess of 2 weeks would be deducted from his basic displacement pay. Finally, if this same Employee is rehired under circumstances which would entitle his Continuous Service to be bridged (see "Continuous Service" above), he would commence to "earn" his annual pre-break entitlement of 4 weeks in monthly increments of 1/12th over the remainder of the calendar year in which the Employee was displaced.

**Personal Leave of Absence** — If an employee is on an approved personal leave of less than six months' duration on their official displacement effective date, the leave is canceled and their displacement is immediately effective.

**Club Memberships** — Club memberships may be maintained for a period of up to

60 days beyond the official displacement effective date. No expenses other than dues will be paid during that 60-day period.

After the 60-day period further eligibility to continue the memberships will be determined by Mellon.

**ShareSuccess Plan** — Vested options must be exercised prior to the date your employment with Mellon is terminated (see "Employment Status", above). Displaced Employees electing salary continuance will continue to receive credit for vesting purposes under the ShareSuccess Plan while receiving such payments and may exercise vested options through the end of the salary continuance period, through the date a lump sum payment is made, or through the date employment is terminated, whichever occurs first.

**Employee Stock Purchase Plan (ESPP)** — Participation in the ESPP is available only to active employees. Displaced employees cease to be treated as an active employee for the ESPP as of their official displacement effective date. Accordingly, participation in the ESPP ends as of the official displacement effective date and displaced employees will not be permitted to purchase any additional shares through the ESPP. Any contributions made during the purchase period prior to the displacement date will be returned without interest. Stock purchased in previous periods may be left in the displaced employee's ESPP account or may be sold through Mellon Investor Services.

**Profit Bonus Plan, Restricted Stock Grants, Stock Options and Other Incentive Plans** — Participation in these programs is in accordance with the terms and conditions of the applicable plans.

**Automobile** — Employees who had full-time use of a company-owned automobile must return the automobile to Fleet Administration on or before the official displacement effective date.

**Additional Information** — For additional information regarding how displacement affects your benefits under any Mellon program, call 1-800-947-HR4U (47478). Customer Service Representatives are available from 8:30 AM to 5:00 PM, Eastern Standard Time, Monday-Friday.

## AMENDMENT OR TERMINATION OF THE PROGRAM

While Mellon has no present intention to terminate the Program, it has expressly retained the right to amend, modify or terminate the Program at any time; with such powers to amend, modify or terminate being exercisable by the Program Administrator. Notwithstanding the preceding sentence or applicable law, no amendment or modification (including, but not limited to, an act of terminating or eliminating Program provisions) made to the Program by Mellon or the Program Administrator which reduces either (a) the benefits provided by the Program or (b) the circumstances in which such benefits shall be provided shall be effective with respect to any displacement occurring after any "Change in Control Event," as such term is defined in the Mellon Bank Retirement Plan, and within the three (3) years following such Event unless such amendment or modification was adopted by Mellon or the Program Administrator at least twelve (12) months prior to the Change in Control Event (the "12 Month Waiting Period"); provided, however, that Mellon expressly reserves to itself and the Program Administrator the right to amend

and modify (including, but not limited to, an act of terminating or eliminating Program provisions) the provisions of the Program subject only to the satisfaction of such 12 Month Waiting Period.

Employees eligible to receive benefits under the Program will be notified of any material modifications to the Program.

**Effect of Conflicting Provisions** — This Program Document, together with any subsequent amendments adopted by Mellon or the Program Administrator, sets forth all the terms and conditions governing the provision of displacement benefits to eligible employees. In the event that the terms of any written or oral description of Program benefits conflicts with the terms of this Program Document, the terms of this Program Document shall control.

## UNEMPLOYMENT COMPENSATION

Receipt of benefits under the Program may affect your eligibility to receive any unemployment compensation benefits provided by your state of residence. Each state has its own rules and regulations and your eligibility for unemployment compensation benefits will be determined by your home state. If you have questions, you are encouraged to contact your local state unemployment office.

However, receipt of salary continuance payments under the SUB Program may not adversely affect your eligibility to receive unemployment compensation benefits in many states. Again, refer to the SUB Program summary plan description for details on whether you are eligible to and how to participate in the SUB Program.

## CLAIM AND APPEAL PROCEDURES

A request for benefits must be presented in writing to the Program Manager. If the request is wholly or partially denied, you will be advised in writing within 90 days after receipt of the claim by the Program Manager (unless special circumstances require an extension of time) of the specific reason for the denial. If you disagree with the decision on your request for benefits, you may request that the decision be reviewed by the Program Administrator. Any such appeal must be made in writing to the Program Administrator within 60 days after receiving the written denial from the Program Manager and must include the basis upon which the review is requested, including, but not limited to, pertinent Program provisions, prior decisions, and/or statement of facts or circumstances in your possession which are pertinent to your request for benefits. The Program Administrator will conduct a full and fair review of the claim and render a written decision to the claimant within 60 days after the receipt of the written appeal (unless special circumstances require an extension of time). The decision on appeal will contain the specific reason on which the decision is based. The decision of the Program Administrator shall be final.

If you fail to appeal any denial of a request for benefits in the manner and within the deadlines specified above, you waive your right to request a review of the Program Manager's decision and you are barred from again making the same request for benefits.

## ADDITIONAL FACTS ABOUT THE PLAN

| | |
|---|---|
| **NAME OF PLAN** | Mellon Financial Corporation Displacement Program |
| **NAME OF EMPLOYER** | Mellon Financial Corporation<br>One Mellon Bank Center<br>Pittsburgh, PA  15258 |
| **EMPLOYER IDENTIFICATION NUMBER** | 25-1233834 |
| **PROGRAM MANAGER** | Manager, Corporate Displacement Plan<br>Mellon Financial Corporation<br>Two Mellon Bank Center<br>Room 152-1025<br>Pittsburgh, PA  15259-0001 |
| **PROGRAM ADMINISTRATOR** | The Program Administrator is:<br><br>The Human Resources Department<br>Mellon Financial Corporation<br>One Mellon Bank Center<br>Pittsburgh, PA  15258 |
| **AGENT FOR SERVICE OF LEGAL PROCESS** | Department Head<br>Human Resources Department<br>Mellon Financial Corporation<br>One Mellon Bank Center<br>Pittsburgh, PA  15258 |
| **PLAN NUMBER** | 501 |
| **PLAN YEAR** | January 1 to December 31 |
| **TYPE OF PLAN** | Welfare benefit plan |
| **PLAN FINANCING** | Unfunded; paid out of general assets of employer |

January 2005

# ERISA RIGHTS STATEMENT

Government regulations require that all Summary Plan Descriptions include the statement shown below. The statement was drafted by the government.

As a participant in the Program, you are entitled to certain rights and protections under the Employee Retirement Income Security Act of 1974 (ERISA). ERISA provides that all program participants shall be entitled to:

- Examine, without charge, at the Program Administrator's office and at other specified locations, such as work sites, all Program documents, and copies of all documents filed by the program with the U.S. Department of Labor.

- Obtain copies of all program documents and other program information upon written request to the Program Administrator. The administrator may make a reasonable charge for the copies.

In addition to creating rights for program participants, ERISA imposes duties upon the people who are responsible for the operation of the employee benefit program. The people who operate your program, called "fiduciaries" of the plan, have a duty to do so prudently and in the interest of you and other program participants and beneficiaries. No one, including your employer or any other person, may fire you or otherwise discriminate against you in any way to prevent you from obtaining a benefit or exercising your rights under ERISA. If your claim for a benefit is denied or ignored, in whole or in part, you have a right to know why this was done, to obtain copies of documents relating to the decision without charge, and to appeal any denial, all within certain time schedules.

Under ERISA, there are steps you can take to enforce the above rights. For instance, if you request materials from the Program and do not receive them within 30 days, you may file suit in a federal court. In such a case, the court may require the Program Administrator to provide the materials and pay you up to $110 a day until you receive the materials, unless the materials were not sent because of reasons beyond the control of the administrator. If you have a claim for benefits which is denied or ignored, in whole or in part, you may file suit in a state or federal court. If it should happen that program fiduciaries misuse the program's money, or if you are discriminated against for asserting your rights, you may seek assistance from the U.S. Department of Labor, or you may file suit in a federal court. The court will decide who should pay court costs and legal fees.

If you are successful, the court may order the person you have sued to pay these costs and fees. If you lose, the court may order you to pay these costs and fees, for example, if it finds your claim is frivolous.

If you have any questions about your Program, you should contact the Program Administrator. If you have any questions about this statement or about your rights under ERISA or if you need assistance in obtaining documents from the Program Administrator, you should contact the nearest Office of the Employee Benefits Security Administration, U.S. Department of Labor listed in your telephone directory or the Division of Technical Assistance and Inquiries, Employee Benefits Security Administration, U.S. Department of Labor, 200 Constitution Avenue N.W., Washington, DC 20210. You may also obtain certain publications about your rights and responsibilities under ERISA by calling the publications hotline of the Employee Benefits Security Administration. You may also contact the Human Resources specialist at your site or Benefits in Pittsburgh.

January 2005

January 2005                              -16-

ATTACHMENT "2"

 **Mellon**

Legal Department

(412) 234-3708

February 15, 2006

**RECEIVED**
FEB 15 2006

Via Certified Mail and UPS
Tracey S. Bernstein,
Himmel & Bernstein, LLP
Attorneys at Law
928 Broadway, Suite 1000
New York, NY 10010
Facsimile:    212-631-0205

> RE:    Raymond Van Cott Appeal of Denial of Benefits under the Mellon
>         Displacement Program.

Dear Attorney Bernstein:

As you know, Lisa B. Peters, Executive Vice President of Human Resources, Mellon Financial Corporation, is the Program Administrator ("Program Administrator") for the Mellon Financial Corporation Displacement Program (the "Program"). By letter dated October 18, 2005, you requested that the Program Administrator review the Program Manager's denial of your client's claim for Program benefits as set forth in her letter of October 3, 2005 (the "Appeal"). Pursuant to your request, the Program Administrator conducted an independent examination of the information originally submitted in support of Mr. Van Cott's claim as well as the information gathered by the Program Manager. She also conducted her own investigation and gathered additional information relevant to your client's claims under the Program[1]. After due consideration of all the evidence, the Program Administrator determined to DENY your client's appeal and UPHOLD the Program Manager's initial decision. The Program Administrator has requested that I set forth the basis for her denial in a writing which complies with the requirements of the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001, et. Sec., ("ERISA").

## APPLICABLE PROGRAM PROVISIONS

The Program provides that:

---

[1]    We recognize that Mr. Van Cott also asserts entitlement to "Transition Package" benefits under the December 3, 2004 "Confidential Special Retention Package" offered by James D. Aramanda (the "Retention Package"). Under the Retention Package, Mr. Van Cott would be entitled to Transition Package benefits if, among other conditions, he is found to have been "displaced" within the meaning of the Displacement Program as a direct result of the closing of the sale of Mellon's Human Resources & Investor Solutions Sector ("HR&IS"). As the Program Administrator has determined that Mr. Van Cott is not eligible for Program benefits, I am authorized to advise you that Mr. Van Cott is also not eligible for Transition Package benefits.

[An employee is] eligible to receive benefits (displacement payments and certain benefit coverage) if [his/her] employment ceases due to technological change or another business reason not related to individual performance.

An employee is **not eligible** to receive benefits under the Program in the following cases:

* * *

- When the employee's employment with a Participating Mellon Company is affected by Mellon's sale of a business or by Mellon's contracting for or otherwise <u>transferring the employee's employment functions to another employer where the terms of the sale, contract or transfer provide</u> for employment of the employee by another employer and Mellon determines (such determination being made in Mellon's sole discretion) <u>that the position to be provided to the affected employee</u>:

    - Does not involve a significant change in responsibilities from those assigned to the employee immediately prior to the sale or transfer

    - Unless otherwise provided in the terms of the sale, contract or transfer, is at a location within a thirty (30) mile radius of the employee's location immediately prior to the sale or transfer

    - Initially provides base salary and incentive compensation opportunities which, in the aggregate, are reasonably similar to those provided by the Participating Mellon Company immediately prior to the sale or transfer

* * *

Like most displacement benefit plans, the benefits provided under the Program are intended to help displaced employees "bridge the gap" between periods of employment or retirement income. ...2

Standard of Review on Appeal:

The Program provides that Mellon retains the sole discretion to determine whether an employee is eligible for Program benefits. A request for Program benefits must be provided to the Program Manager, who will conduct a full and fair review of the request and any information provided in support of the request. Upon written request, the Program Administrator will conduct a full and fair review of any denial of Program benefits by the Program Manager.

**DOCUMENTS REVIEWED:**

---

2    Pages 1, 2 and 8 of the January 2005 Program (emphasis added).

As part of her investigation of your client's claim on appeal, the Program Administrator reviewed the following documents:

1.   December 3, 2004 Special Retention Agreement.
2.   Mellon Financial Corporation Displacement Program, dated January 1, 2005.
3.   Raymond Van Cott's employment profile dated May 27, 2005.
4.   Section 14.1 of the Purchase Agreement and Page 52, number 2977 of the list of transferred employees.
5.   Frequently Asked Questions provided to Mellon Employees via Mellon's Intranet to the Mellon employees transferring to ACS.
6.   Employee Information Guide Transition from Mellon to ACS, May 24, 2005.
7.   Raymond Van Cott's employment profile dated January 26, 2006.
8.   Mr. Van Cott's July 6, 2005 claim for Program benefits.
9.   The Program Manager's October 3, 2005 denial.
10.   Mr. Van Cott's October 18, 2005 Appeal, which includes a copy of Ingrassia v. Shell Oil Company, 394 F. Supp. 875 (S.D.N.Y. 1975).
11.   December 13, 2005 request for an extension of time.

## IMPORTANT DATES

**07/13/1998**   Mr. Van Cott is hired by Mellon to work in HR&IS.

**01/01/2002**   Mr. Van Cott's title at HR&IS becomes Regional Information Systems Executive, Senior Vice President.

**12/3/2004**   Special Retention Package provided to Mr. Van Cott. [3]

**03/15/2005**   Mellon Financial Corporation and ACS enter into a Purchase Agreement for ACS to purchase HR&IS (the "Purchase Agreement.")[4], which includes a list of employees (the "US Transferred Employees") whose employment would be transferred to ACS on the Closing.[5]

The terms of the Purchase Agreement provide that the employment of each US Transferred Employee (which includes Mr. Van Cott) would continue (i) without a significant change in responsibilities from those assigned to him; (ii) at a location within a 30 mile radius from his principal work location immediately prior to the transfer of such employment, and (iii) with a base salary and incentive compensation opportunities which, in the aggregate, are reasonably similar to those provided to him immediately prior to the transfer.

**03/17/2005**   Following the execution of the Purchase Agreement, all Mellon HR&IS employees are provided intranet access via Mellon's internal website to a series of explanatory questions and answers (the "FAQs") regarding the

---

[3]   As noted above, since the Program Administrator has determined that Mr. Van Cott does not meet the Program's definition of "Displaced," then he is likewise not entitled to the Transition Package benefits provided by the Retention Program.

[4]   The entire agreement, including all exhibits, is incorporated by reference; only relevant portions are produced herein.

[5]   Mr. Van Cott is listed as number 2977 on Page 52 of the final document.

sale and transition of the HR Consulting and Outsourcing Businesses to ACS.

| | |
|---|---|
| 05/01/2005 | Retroactive Effective Date of sale of HR&IS to ACS (for financial accounting purposes). |
| 05/24/2005 | All Mellon HR&IS employees transferring to ACS are provided a copy of an "Employee Information Guide" summarizing the FAQs and providing more detailed information regarding the effect of the sale on the pension, welfare and fringe benefit plans covering affected US Transferred Employees. |
| 05/25/2005 | Sale of HR&IS to ACS completed and the employment of all US Transferred Employees (including Mr. Van Cott's) is transferred to ACS as of 11:59:59 pm on this date. |
| 05/26/2005 | Mr. Van Cott's employment with ACS commences with the same title and position prior to the sale. |
| 07/06/2005 | Mr. Van Cott applies for Program benefits, as well as Transition Package benefits provided under his Confidential Special Retention Package. |
| 10/03/2005 | The Program Manager denies Mr. Van Cott's claim.[6] |
| 10/18/2005 | Mr. Van Cott appeals the October 3, 2005 denial, forwarding a copy of the Ingrassia decision. |
| 12/13/2005 | Mellon requests an extension of time within which to provide a written decision up to and including February 16, 2005. |

## CLAIM:

On July 6, 2005, Mr. Van Cott filed a claim for Program benefits with the Program Manager. In support of his claim, Mr. Van Cott asserted that he is entitled to these benefits because he was (1) a full-time Mellon employee whose employment was affected by the sale of HR&IS and (2) his position at ACS involved a significant change in responsibilities from those at HR&IS.

On October 3, 2005, you were informed of the Program Manager's decision to deny Mr. Van Cott's claim for Program benefits.[7] While the Program Manager agreed that Mr. Van Cott's employment was transferred to ACS as a result of its acquisition of HR&IS, she did not find that Mr. Van Cott was "Displaced", as defined by the Program. At this time, Mr. Van Cott was informed of his right to appeal the Program Manager's decision and, if applicable, detail the basis for his appeal, including relevant Program provisions, prior decisions and/or statements of facts or circumstances in his possession relevant to his claim for benefits.

---

[6]    Barbara K. Ross, the Senior Counsel-Employee Relations, informed Mr. Van Cott and yourself of this decision on behalf of the Program Manager.

[7]    See footnote 6.

- 4 -

On or about October 18, 2005, the Program Administrator received your appeal on behalf of Mr. Van Cott with the <u>Ingrassia</u> decision attached. This appeal asserts that Mr. Van Cott is entitled to Program benefits since (1) "he was a full-time employee whose employment was 'affected by the sale of a business or by Mellon's contracting for or otherwise transferring the employee's employment functions to another employer" and (2) "his position upon transfer suffered a significant change in responsibilities from those assigned to the employee immediately prior to the sale or transfer." These are essentially the same arguments raised in Mr. Van Cott's initial claim for Program benefits.

## FACTS AND FINDINGS:

Mr. Van Cott was an employee of HR&IS until the sale of its stock to ACS as of 11:59:59 on May 25, 2005.[8] Mr. Van Cott's final position at HR&IS was Senior Vice President and Chief Information Officer for the NY & NJ Region. The Purchase Agreement provided, among other things, that ACS would purchase Mellon's 100% stock interest in all of HR&IS operations in the United States.

Mr. Van Cott's employment was transferred to and continued by ACS pursuant to the terms of the Purchase Agreement. Mr. Van Cott is listed in the Purchase Agreement as a U.S. Transferred Employee.[9] Section 14.1(b) of the Purchase Agreement mandates that continued employment for all U.S. Transferred Employees would initially (i) not involve a significant change in responsibilities; (ii) be at a location not more than 30 miles from the Mellon work location of such employment; and (iii) provide base salary and incentive compensation opportunities which, in the aggregate, are reasonably similar to those provided immediately prior to the transfer.

## Application of Displacement Program Provisions to Claimants' Circumstances:

The terms of the Program provide that in the context of a sale transaction, employees are NOT eligible for benefits under the Displacement Program if: the terms of the sale, contract or transfer provide for employment of the employee by another employer and Mellon determines (such determination being made in Mellon's sole discretion) that the position to be provided to the affected employee:

- does not involve a significant change in responsibilities from those assigned to the employee immediately prior to the sale or transfer;

---

[8]  Although Mr. Van Cott continued to be an HR&IS employee after the May 25th closing, he ceased to be employed by Mellon or one of its subsidiaries. Most of the pension, welfare and fringe benefits, including the Displacement Program, ("Benefit Plans") provided to HR&IS employees are actually sponsored by Mellon. Consequently, the sale of HR&IS had the effect of both: (a) terminating his participation in or eligibility for any benefit plan sponsored by Mellon; and (b) changing his status as an employee of a corporation included within the Mellon family of businesses (the "Mellon Group") to that of an employee of a corporation wholly-owned by ACS (the "ACS Group").

[9]  Page 52, number 2977 of the list of transferred employees

- unless otherwise provided in the terms of the sale, contract or transfer, is at a location within a thirty (30) mile radius of the employee's location immediately prior to the sale or transfer; or

- initially provides base salary and incentive compensation opportunities which, in the aggregate, are reasonably similar to those provided by the Participating Mellon Company immediately prior to the sale or transfer.

It is clear that ACS initially offered Mr. Van Cott the same pay that he received in his HR&IS position.[10] In addition, there is no dispute that Mr. Van Cott's work location (New York, NY) is the same. Mr. Van Cott does assert, however, that his position with HR&IS and ACS after the sale is substantially different from his position with HR&IS and Mellon before the sale and that this difference entitles him to Program benefits.

In his July 6, 2005 letter in support of this assertion, Mr. Van Cott compares: his position in the organizational structure before and after the sale, the number of employees reporting to him before and after the sale, and the size of his budget before and after the sale. Specifically, Mr. Van Cott asserts that, prior to the sale: he held the position of Senior VP and Regional Sector Chief Information Officer (that is, two levels below the executive management team)[11]; he had approximately 744 full time employees reporting to him and was responsible for managing a budget of $112 million. Following the sale, Mr. Van Cott asserts that: he holds the equivalent of a Mellon vice president's position (that is, three levels below the executive management team)[12] at ACS, supervises only 162 full time employees and oversees a budget of $30 million.

The Program Manager considered the arguments raised by Mr. Van Cott in the context of the terms of the Program. By letter dated October 3rd, 2005 the Program Manager determined that Mr. Van Cott did not experience a significant reduction in his responsibilities before and after the transaction and, as such, was not entitled to Program benefits. In support of her finding, the Program Manager determined that the terms of the Purchase Agreement provided for Mr. Van Cott's employment with HR&IS to continue after the sale under "terms that, in the aggregate, are comparable to the terms of employment applicable" to him prior to the sale. The Program Manager also found that Mr. Van Cott continues to hold the title of SVP and Regional Information Systems Executive and that he continues to serve as the senior systems representative for HR&IS and ACS. In addition, without conceding that Mr. Van Cott's reporting level is

---

10    The Program Administrator noted that Mr. Van Cott has never raised the claim that the incentive compensation and benefits provided at ACS were different than those provided at HR&IS. Nonetheless, her investigation of Mr. Van Cott's claim revealed no evidence of differences between the ACS and HR&IS incentive compensation and benefits.

11    Mr. Van Cott reported to Kevin Shearan, EVP, who reported to Allan Woods, Vice Chairman.

12    Mr. Van Cott now reports to a Managing Director, who reports to a Senior Managing Director, who reports to a member of the Executive Management Team.

one step lower than it was prior to the sale, the Program Manager determined that a drop of one reporting level would not be "significant" for purposes of the Displacement Program.

In conducting her review, the Program Manager determined that relevant inquiry is whether there has been a significant post-transfer change in the *nature*, rather than the *scale*, of the responsibilities from those assigned to the employee immediately prior to the sale. For example, the Program Manager found that reductions in the number of employees supervised and the dollar value of the budget overseen were reductions in scale not rising to the level of affecting a significant change in the fundamental *nature* of the duties and responsibilities assigned to a senior systems analyst. Finally, the Program Manager determined that since the terms of the Purchase Agreement provided for his transfer and there was no "significant" change in his post-sale job responsibilities, Mr. Van Cott was not entitled to Displacement Program benefits.

In the October 18, 2005 appeal of the Program Manager's decision, Mr. Van Cott does not offer any evidence to refute the findings of the Program Manager. Instead, he makes two assertions: (1) that "scale" is the primary issue to be considered in evaluating whether there has been a "significant change in responsibilities" and (2) that requiring a buyer to continue employment "without a significant change in responsibilities" does not guarantee that the buyer will honor its commitments.

In support of your assertion that "scale" is the primary issue, you point to a pre-ERISA[13] case, Ingrassia, which interprets a non-discretionary severance policy in the context of an internal reorganization. In the Ingrassia decision, Shell Oil transferred its main offices from New York to Houston. The terms of the retention / severance policy denied benefits to affected employees who declined "roughly equivalent positions" in the New York area. Mr. Ingrassia was offered a position at the same salary and title but his responsibilities were downgraded from National to Regional. The district court found that Mr. Ingrassia's chances for advancement in the offered position were less, that it amounted to a reduction in rank and, significantly, that the author of the policy – and the person apparently responsible for making "case by case" determinations on whether an offered job was "roughly equivalent" – did not evaluate Mr. Ingrassia's request for severance pay. Based on these findings – and applying New York state contract law only – the court determined that the job offered to Mr. Ingrassia was not "roughly equivalent" and directed that he be awarded severance pay.

The Program Administrator determined that the Ingrassia decision is distinguishable from Mr. Van Cott's claim. First, the terms of the severance policy at issue in Ingrassia did not expressly grant the employer the sole discretion to determine whether the offered job was "roughly equivalent". Here the Program grants Mellon such discretion. Second, Ingrassia was decided under New York contract law – which would

---

13    The Employee Retirement Income Security Act of 1974, as amended, was generally effective
      January 1, 1976.

tend to decide ambiguities against the drafter – rather than under ERISA which would uphold the decision of the plan manager unless it was "arbitrary or capricious". The Program is an ERISA covered employee welfare benefit plan, and, as such, ERISA, and not state contract law, would provide the applicable law to Mr. Van Cott's claim. Third, the transaction at issue in Ingrassia involved an internal reorganization – rather than the sale of business – such that comparisons of the "scale" of the positions offer to Mr. Ingrassia before and after the reorganization could be made by the same employer on an "apples to apples" basis. Since HR&IS was sold to an unrelated third party, the Displacement Program does not contemplate that the Program Manager will attempt to evaluate each employee's post-closing job responsibilities. Rather, the Program requires that the evaluation of whether the post-transfer job involves a "significant change in responsibilities" be made on or before the transfer. Finally, Ingrassia involved an employee who had declined the offered position and was not receiving any income rather than an employee who continued to work after the closing, suffered no interruption in wages and is, in effect, requesting double payment for a single period of service.[14]

Unlike the question before the Ingrassia court, the Program Administrator determined that the issue under appeal reduces to whether Mellon (acting through the Program Manager) was arbitrary or capricious in determining that the continued employment offered to Mr. Van Cott by ACS did not represent a significant change in responsibilities from those assigned to him immediately prior to the sale of HR&IS to ACS. After reviewing all the evidence considered by the Program Manager as well as the additional evidence submitted on appeal, the Program Administrator determined that the Program Manager's decision was neither arbitrary nor capricious for the following reasons:

- The Program expressly gives the Program Manager sole discretion to determine whether or not continued employment involves a "significant change" in responsibilities"

- The "sale of business" provisions of the Program (quoted above) are to be applied on a "snap shot" basis. That is, that since Mellon, as seller, does not continue as the employer of the transferred employees after the sale, the "sale of business" provisions of the Program necessarily contemplate that the Program Manager will rely on: (a) the Buyer's representations in the sale agreement not to affect a significant change in duties and/or (b) the structure of employment transfer itself (e.g., stock sale, asset sale, etc.,) in making a determination whether a particular employment transfer involves a "significant change in responsibilities"

---

[14]   As noted in the text corresponding to footnote 2, benefits provided under the Program are intended to help displaced employees "bridge the gap" between periods of employment or retirement income.

- Applying the "sale of business" exception on a "snap shot" is reasonable since Mellon needs to know who is entitled to Program benefits on the closing date so as to: (a) take Program-related liabilities into account as part of the overall cost of the transaction; (b) notify affected employees two weeks before their displacement effective date; and (c) remove displaced employees from the roster of employees transferred at the closing date.

- As a matter of corporate law, a transferred employee's employment relationship with his immediate employer continues without change when the transaction is structured as a sale of the stock

- In the instant transaction, the stock of HR&IS was sold and the employment relationship of all U.S. Transferred Employees with their employer continued without change. In Mr. Van Cott's particular situation, his job duties, pay and location were unchanged following the closing and Mr. Van Cott was the most senior systems analyst at HR&IS and ACS after the closing.

- That it was reasonable for the Program Manager not to take changes in the "scale" of a continued position into account in determining whether to award Displacement Program benefits as sale transactions will almost always involve changes in scale (the Buyer will almost always be larger or smaller) and to award Displacement Program benefits based on something as subjective as changes in scale would render the "sale of business" exception in the Displacement Program virtually meaningless and make every employee transferred to a smaller employer entitled to benefits.

- That not taking changes in scale into account in applying the "sale of business" exception is consistent with the stated intent of the Program: (a) to provide displacement payments and certain benefit coverages to eligible employees displaced from their jobs for business reasons not related to individual performance; and (b) to help displaced employees "bridge the gap" between periods of employment or retirement income; and that it would be inconsistent with this intent to provide Program benefits to an employee who has maintained his salary, title, and benefits with a buyer who happens to a smaller organization.

## ERISA RIGHTS

Based upon these factors, the objective evidence in the administrative record and the discretionary authority expressly vested in the Displacement Program Administrator, the Program Administrator has authorized me to advise you that she has determined to UPHOLD the Program Manager's original decision to deny Mr. Van Cott's claim for Program benefits and DENY Mr. Van Cott's Appeal. The Program

Administrator's decision is final and Mr. Van Cott has now exhausted his administrative options under the Displacement Program. Although Mr. Van Cott's administrative options are over, the Program Administrator is required by law to inform you that Mr. Van Cott now has the right to (a) bring a civil action under Section 502(a) of ERISA; and (b) receive, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to his claim for Program benefits which have not been previously provided or included with this letter.

Very truly yours,

Barbara K. Ross, Esquire
Counsel to the Mellon Financial Corporation Displacement Program
On Behalf of the Program Administrator, Lisa B. Peters.

Cc:    Lisa B. Peters, Displacement Program Administrator
       Audrey F. Bonnett, Displacement Program Manager

List of Enclosures (attached)

- 10 -

Bcc:   Russell J. Boehner, Esq.
       Kristen E. Belz, Esq.

## LIST OF ENCLOSURES:

1. December 3, 2004 Special Retention Agreement.
2. Mellon Financial Corporation Displacement Program, dated January 1, 2005.
3. Raymond Van Cott's employment profile dated May 27, 2005.
4. Section 14.1 of the Purchase Agreement and Page 52, number 2977 of the list of transferred employees.
5. Frequently Asked Questions provided to Mellon Employees via Mellon's Intranet to the Mellon employees transferring to ACS.
6. Employee Information Guide Transition from Mellon to ACS, May 24, 2005.
7. Raymond Van Cott's employment profile dated January 26, 2006.
8. Mr. Van Cott's July 6, 2005 claim for Program benefits.
9. The Program Manager's October 3, 2005 denial.
10. Mr. Van Cott's October 18, 2005 Appeal, which includes a copy of <u>Ingrassia v. Shell Oil Company</u>, 394 F. Supp. 875 (S.D.N.Y. 1975).
11. December 13, 2005 request for an extension of time.

ATTACHMENT "3"

 **Mellon**

**Human Resources & Investor Solutions**

James D. Aramanda
*Vice Chairman*

December 3, 2004

Mr. Raymond Van Cott
1347 Rustic Ridge Road
Yorktown Heights, NY 10598

Re:     Confidential Special Retention Package

Dear Ray:

As we have discussed, Mellon has made the decision to divest the Human Resources & Investor Solutions Sector ("HR&IS"). In view of this decision, Mellon has established a Confidential Special Retention Package, which it will provide to certain employees in the HR&IS Sector who will be instrumental in the divestiture and related transition. As one of the employees to whom this is offered, you will be eligible for the Special Retention Package outlined below if and when the following conditions are met:

1. You remain an *Active*[1] Mellon employee until the *Closing* and Mellon *Releases* you; and

2. You are not on a Final Written Warning under the Corrective Action Policy; and

3. You actively participate and support the critical client retention measures and maximize the value of the business during the sales process; and

4. All of your Mellon business expenses, including your Mellon business credit card, are current; and

5. You abide by your Mellon confidentiality obligations, including, but not limited to, any provisions pertaining to confidentiality set forth in any agreement you previously signed; and

6. Mellon *Closes* on the sale and Mellon *Releases* you as the direct result of the *Closing*.

*Providing* you meet all of the above necessary conditions, you will receive the following Confidential Special Retention Package:

---

[1] The definitions of the italicized words are set forth in Appendix A.

Overpeck Centre • 85 Challenger Road • Ridgefield Park, NJ 07660
(201) 296-4463 Office • (201) 296-4004 Fax • aramanda.j@mellon.com
www.mellon.com

*A Mellon Financial Company.*[SM]

Page 2

 **Mellon**

**Retention Bonus Award** in the amount of $300,000; and

**Supplemental Retention Bonus Award** of 0 to 6 months (target of 3 months) of your base salary in effect on November 1, 2004, determined at my sole discretion and based upon the following criteria:

- Positive participation in sales process; and
- Acting in the best interest of Mellon, including interaction with clients and all matters impacting Mellon's financials; and
- Overall leadership, including demonstrated support of Mellon and maintaining positive staff morale.

Both the Retention Bonus Award and the Supplemental Retention Bonus Award, less all applicable taxes and deductions, will be payable within 60 calendar days after the date that Mellon and a Buyer *Close* on the sale and Mellon, in its sole discretion, *Releases* you for reasons other than cause from your assignment because Mellon, in its sole discretion, determines you have satisfied your responsibilities.

**Transition Package** In addition to the Retention Bonus Award and Supplemental Retention Bonus Award, you may be eligible for a Transition Package, if you are *Displaced* in accordance with the Mellon Financial Corporation Displacement Program as a direct result of the *Closing* and you execute a Confidential Separation Agreement and Release waiving any potential claims against Mellon. The Transition Package consists of:

**Transition Pay** As otherwise in compliance with applicable laws and regulations, you will receive a Maximum Separation Pay Amount in the equivalent of fifty-two (52) weeks of your base salary at the time of your *Displacement*, less all applicable taxes and deductions ("**Maximum Separation Pay Amount**"). Such Maximum Separation Pay Amount shall be reduced by the full amount of the *Displacement* pay, Supplemental Unemployment Benefits and/or separation or severance pay provided under a previously provided separate agreement (before taxes and deductions) paid to you. Such Transition Pay (except as noted below) will be paid in equal installments on regularly scheduled pay dates. It is recognized and agreed that should you commence other new employment, other than at Mellon, prior to the payment of the final installment of Transition Pay, Mellon will pay any remaining installments in a lump sum, less all applicable taxes. In the event of a lump sum payout, your eligibility to participate in the Mellon 401(k) Retirement Savings Plan and the Mellon Bank Retirement Plan or other Qualified Plans ("Qualified Pension Plans") will be deemed to have terminated effective the day before any such lump sum payout is made and no portion of the Transition Pay represented by the lump sum payout shall be taken into account for any purpose under the Qualified Pension Plans. In addition, such lump sum payout will not be taken into account for any purpose under any nonqualified pension plan.

Page 3

 **Mellon**

**Executive Level Outplacement Services**  You will also receive, at Mellon's expense through a company chosen by Mellon, **Executive Level Outplacement Services** (out-placement counseling, resume preparation, and phone and mail service), but Mellon will neither provide nor be responsible for any other costs or expenses incurred by you in a search for employment including, but not limited to, travel, lodging, meals or fees.

Questions regarding your Special Retention Package should be directed to Janice Duckworth at 412-234-7829.

Very truly yours,

James D. Aramanda

Enclosures

Nothing in this letter is an express or implied contract or promise for, or creates any rights to, continued employment or employment for a fixed term with Mellon Financial Corporation or its subsidiaries, affiliates, related companies or successor.  You will remain at all times an employee at will.  In addition, please be advised that nothing in this letter is to be construed as a notification of your *Displacement* under the Mellon Financial Corporation Displacement Program.  In the event of a conflict between the Special Retention Package and the applicable plan documents or agreements, the plan documents or agreements control.

MAY 17 2005 07:50 FR MELLON FINANCIAL     201 363 3748 TO 912126310205     P.12/18

Page 4

 **Mellon**

## Appendix A

### Definitions

**Active** means that you are on payroll in an "active" status and not on a leave of absence.

**Closing or Close** means the date that the sale of the HR&IS Sector is complete and consummated or in the event that the entire HR&IS Sector is not sold in the same transaction, Mellon *Closes* on the sale of a corporate entity, distinct line of business or portfolio in the HR&IS Sector to which you are assigned at the time of the *Closing*, including Shared Service Employees supporting the HR&IS Sector.

**Displaced or Displacement** has the meaning ascribed to it in the Mellon Financial Corporation Displacement Program ("Displacement Program"), as such may be amended from time to time. A copy of the current Displacement Program is enclosed. See pages 2 and 3 of the Displacement Program for information related to eligibility.

**Release** means that as the direct result of the *Closing* of the sale of the HR&IS Sector or a corporate entity, distinct line of business or portfolio within the HR&IS Sector to which you were assigned at the time of the *Closing*, including Shared Service Employees supporting the HR&IS Sector, that Mellon, in its sole discretion, determines you have satisfied your responsibilities and relieves you of your assignment for reasons other than for cause by:

Transferring your employment to another position within Mellon (regardless of whether you accept);

Transferring your employment to a Buyer (regardless of whether you accept); or

Displacing you within the meaning of the Displacement Program.

## CERTIFICATE OF SERVICE

I, Paul P. Rooney, Esq., hereby certify that on July 16, 2007, I caused the annexed

AFFIDAVIT OF AUDREY BONNET to be served upon Plaintiff's counsel listed below by

filing it with the Court by means of the Court's Electronic Case Filing system pursuant to Fed. R.

Civ. P. 5 and Local Civil Rule 5.2:

        Tracey S. Bernstein
        Himmel & Bernstein, LLP
        928 Broadway, Suite 1000
        New York, New York 10010

                        PAUL P. ROONEY

Dated: July 16, 2007