Tracey S. Bernstein (TB-0405)
HIMMEL & BERNSTEIN, LLP
Attorneys for Plaintiff Raymond Van Cott
928 Broadway, Suite 1000
New York, NY 10010
(212) 631-0200

UNITED STATES FEDERAL COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
**RAYMOND VAN COTT,**

                Plaintiff,

                -against-

**MELLON FINANCIAL CORPORATION
DISPLACEMENT PROGRAM,**

                Defendant.
------------------------------------------------------------x

**AMENDED COMPLAINT**

07 Civ. 5578 (MGC)(RLE)

      Plaintiff RAYMOND VAN COTT, by his attorneys Himmel & Bernstein, LLP, complaining of defendant MELLON FINANCIAL CORPORATION DISPLACEMENT PROGRAM alleges as follows:

      1.    This is an action arising under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §1001 *et. seq*, to recover benefits due under an employee benefit plan and to recover costs and attorney's fees as provided for by ERISA.

### I. JURISDICTION AND VENUE

      2.    This Court has subject matter jurisdiction pursuant to Section 502(e)(1) of ERISA, 29 U.S.C. §1132(e)(1), and 28 U.S.C. §1331. Under Section 502(f) of ERISA,

29 U.S.C. §1132(f), this Court has such jurisdiction without respect to the amount in controversy or the citizenship of the parties.

3. Venue is properly in this judicial district pursuant to Section 502(e)(2) of ERISA, 29 U.S.C. §1132(e)(2), in that defendant "resides" in the Southern District of New York within the meaning of 28 U.S.C. §§ 1391(a)(1), (b)(1) and (c) and in that defendant has consented in a written stipulation "So Ordered" by the Court to the Southern District of New York being the proper place of venue.

## II. PARTIES

4. Plaintiff Raymond Van Cott ("plaintiff" or "Mr. Van Cott") is a citizen of the State of New York and resides at 1347 Rustic Ridge Road, Yorktown Heights, New York.

5. Defendant Mellon Financial Corporation Displacement Program ("defendant" or the "Displacement Program") at all times relevant hereto is, and has been, an "employee welfare benefit plan" within the meaning of Section 3(1) of ERISA, 29 U.S.C. §1002(1).

6. At all relevant times, the Displacement Program was an unfunded welfare and benefit plan created and managed for the benefit of the employees of Mellon Financial Corporation, now The Bank of New York Mellon Corporation (hereinafter, "Mellon").

7. At all relevant times Lisa B. Peters, Executive Vice President and Head of Mellon's Human Resources Department, was the Program Administrator of the Displacement Program within the meaning of Section 3(16)(A) of ERISA, 29 U.S.C. §1002(16)(A) and a fiduciary within the meaning of Section 3(21)(A) of ERISA, 29

U.S.C. §1002(21)(A).

## III. FACTUAL BACKGROUND

8. Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 7 of this amended complaint as if fully restated at length herein.

9. On or about July 1998, plaintiff was hired by Mellon Financial Corporation, as a Senior Vice President to run technology for Mellon's retail bank at Mellon's home office in Pittsburgh, Pennsylvania.

10. At the time he was hired by Mellon in July 1998 Mr. Van Cott was had 160 full-time employees reporting to him and managed an annual budget of $22 million.

11. In late 1999, plaintiff was asked to move to the New York Area to manage technology for Mellon's two New York based companies: Dreyfus Mutual Funds and Buck Consulting. The total number of employees reporting to Mr. Van Cott increased to 280 and his annual budget responsibility increased to approximately $40 Million.

12. In 2001 Mellon, increased Mr. Van Cott's responsibilities through the acquisition of Mellon Investor Solutions, formerly Chase Mellon Investor Solutions, by adding another 175 full time employees and increasing his budget responsibilities to $65 million.

13. In January 2002, Mellon promoted plaintiff to Regional Chief Information Officer of New York/ New Jersey. Additionally Mellon acquired the Human Resources Outsourcing firm named Unifi from Price Waterhouse & Coopers. This acquisition increased the total number of employees reporting to him to 950 and the size of his annual budget increased to $148 Million.

14. In January 2003, Mellon merged its Investor Solutions business with its Human Resources business to form the Human Resources and Investor Solutions Sector ("HR&IS"). In May 2003, plaintiff was promoted to SVP and Sector Chief Information Officer. This was in addition to his duties as Regional CIO which still included Dreyfus Mutual Funds and Regional Infrastructure.

15. Upon his promotion to HR&IS sector CIO, plaintiff was making $300,000 in annual salary and received a bonus from Mellon for his work in 2003 of $130,000.

16. In or about the Fall of 2004 Mellon began negotiating to sell the HR&IS business.

17. On or about December 3, 2004, plaintiff and Mellon entered into a Special Retention Package (the "Retention Agreement"). The purpose of the Retention Agreement was to provide plaintiff with certain significant monetary payments in exchange for his commitment to stay with Mellon and forgo other employment opportunities while Mellon was negotiating and completing the sale of HR&IS to ACS.

18. Plaintiff and other senior executives were offered this Special Retention Package as Mellon considered them to be key employees who were essential to closing the deal with ACS and did not want them to look for work elsewhere for work despite the potential harm to their job search and careers from waiting until the deal was completed.

19. Under the terms of the Retention Agreement, if the six (6) conditions outlined therein were met (i.e., the sale to ACS closed, plaintiff was still employed at the time, etc.) plaintiff would be entitled to receive the following payments:

a. A "Retention Bonus Award" in the amount of $300,000.

    b.    A "Supplemental Retention Bonus Award" of 0 to 6 months (target of 3 months) of plaintiff's base salary based on the discretion of Vice Chairman, James Aramanda.

    c.    A "Transition Package" consisting of 52 weeks of plaintiff's base salary and Executive Level Outplacement Services in the event that plaintiff would be considered "Displaced" as that term is defined under the terms of the Mellon Financial Corporation Displacement Program (the "Displacement Program"), and executed a Confidential Separation Agreement and Release.

    20.    Under the terms of the Retention Agreement, Mr. Van Cott remained eligible for benefits under the Displacement Program but his "Transition Pay" of $300,000 would be reduced by any monies received from the Displacement Program should be "Displaced" as that term was defined under the terms of the Displacement Program.

    21.    Under the terms of the Displacement Program, an employee is considered "Displaced," and therefore eligible separation pay and benefits, where the employee's employment has been transferred by Mellon to another employer as a result of a sale of a business and the position to be provided to the employee involves "a significant change in responsibilities from those assigned to the employee immediately prior to the sale or transfer."

    22.    Under the terms of the Displacement Program, when an employee is "Displaced," as that term is defined therein, the employee would be entitled to receive, among other things, "Basic Displacement Pay" of two (2) weeks per year of service, "Extended Displacement Pay" in an amount based upon grade level in the event the

"Basic Displacement Pay" had been exhausted and the employee had not yet obtained a new position, continued 401k, medical, life and retirement benefits and career transition assistance.

23. At the time plaintiff entered into the Retention Agreement he had an annual salary of $300,000 and received a bonus for his work in 2004 of $130,000. Plaintiff also received an annual stock option award valued at approximately $125,000.

24. At the time plaintiff entered into the Retention Agreement he was reporting to the Vice Chairman and Corporate CIO, Allan Woods, and Executive Vice President Kevin Shearan, and indirectly reporting to Vice Chairman and CEO of Dreyfus, Steven Canter, and Vice Chairman and Sector CEO of HR&IS, James Aramanda.

25. At the time plaintiff entered into the Retention Agreement, he was responsible for managing approximately 900 full-time employees and had annual budget responsibility of approximately $148 million.

26. In March 2005 Mellon decided not to sell Investor Solutions in total. Instead, it entered into a sale agreement for the Human Resources portion of HR&IS with Affiliate Computer Services (ACS).

27. On or about May 1, 2005, Mellon closed the ACS deal and plaintiff's employment was transferred to ACS.

28. As of the closing of the ACS deal on or about May 25, 2005, plaintiff's annual base salary was still $300,000.

29. Just prior to closing, Mellon elected to retain as part of Dreyfus Mutual Funds and the Investor Solutions businesses 290 of the 700 full time employees that Mr. Van Cott was responsible for.

30. As a result of the closing of Mellon's sale of HR&IS to ACS, plaintiff's employment was transferred to ACS.

31. Upon his transfer to ACS, due to terminations of superfluous employees and staff transfers to other areas of ACS, plaintiff was now managing approximately 162 full-time employees and overseeing an annual budget of approximately $30 million. This translates into a decrease of more than 78% of his supervisory responsibilities and a decrease of more than 73% of his budgetary responsibilities from the time he entered into the Retention Agreement.

32. In addition, plaintiff's transfer to ACS resulted in a drop in reporting level. Instead of reporting to individuals at the Vice Chairman, CEO, CIO and Executive Vice President level (as he did at Mellon), plaintiff found himself reporting to a Managing Director in Charge of ACS Human Resources Outsourcing Business.

33. Plaintiff's new position and responsibilities at ACS would be, at best, equivalent those he held when he first took the Senior Vice President's position at Mellon in 1998.

34. As a result of these decreases in reporting level, budgetary oversight and supervisory responsibility, plaintiff was "Displaced" as that term is defined under the terms of the Displacement Program as he suffered a "significant change in responsibilities from those assigned to [plaintiff] immediately prior to the sale or transfer."

35. As a result of being "Displaced" plaintiff was entitled to salary and benefits under the terms of the Displacement Program as well as 52 weeks of Transition Pay under the terms of the Retention Agreement.

36. Despite the evidence that Mr. Van Cott was "Displaced" as that term is defined under the Displacement Program when he was transferred to ACS as result of the sale of HR&IS by Mellon, the Displacement Program refused to find that Mr. Van Cott was "Displaced" and remit to plaintiff the salary and benefits provided for under the terms of the Displacement Program.

37. In accordance with the terms of the Retention Agreement, Mellon paid to Mr. Van Cott both the Retention Bonus Award and a Supplemental Bonus Award but refused to remit to Mr. Van Cott the "Transition Pay" because the Displacement Program would not declare Mr. Van Cott as having been "Displaced."

38. By letter dated July 6, 2005 Mr. Van Cott submitted a written claim to the Displacement Program's Program Manager for severance benefits as the position he was provided at ACS involved "a significant change in responsibilities from those assigned to the employee immediately prior to the sale or transfer."

39. By letter dated October 3, 2005, the Displacement Program's Program Manager took the position that Mr. Van Cott had not been "Displaced" and denied his right to receive salary and benefits under the terms and provisions of the Displacement Program.

40. By letter dated October 18, 2005, Mr. Van Cott submitted a written appeal to the denial of his claim for separation pay and benefits under the Displacement Program.

41. By letter dated February 15, 2006, the Ms. Peter's, the Displacement Program's Program Administrator, denied Mr. Van Cott's appeal.

42. Mr. Van Cott fully complied with and exhausted all administrative appeals

for salary and benefits under the terms of the Displacement Program.

### IV.   FIRST CLAIM FOR RELIEF
### (Declaratory Judgment under ERISA)

43.  Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 42 of this complaint as if fully restated at length herein.

44.  At all relevant times, Mr. Van Cott was a participant in the Displacement Program within the meaning of Section 3(7) of ERISA, 29 U.S.C. §1002(7).

45.  Under the terms of the Displacement Program, Mr. Van Cott became entitled to separation pay and other benefits when he was transferred with the sale of HR&IS by Mellon to ACS as Mr. Van Cott suffered a "significant change in responsibilities from those assigned to [him] immediately prior to the sale or transfer."

46.  Despite being "Displaced" as that term is defined under the terms of the Displacement Program, defendant has denied Mr. Van Cott the separation pay and benefits due him under the Displacement Program.

47.  Mr. Van Cott is entitled to a declaration from the Court that, under Section 502(a)(1)(B) of ERISA, 29 U.S.C. §1132(a)(1)(B), he was "Displaced" when his position was transferred to ACS, as well as attorney's fees and costs.

### V.   SECOND CLAIM FOR RELIEF
### (Unpaid Payments and Benefits under ERISA)

48.  Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 47 of this complaint as if fully restated at length herein.

49.  Under the terms of the Displacement Program, Mr. Van Cott became entitled to separation pay and other benefits when he was transferred with the sale of

HR&IS by Mellon to ACS as Mr. Van Cott suffered a "significant change in responsibilities from those assigned to [him] immediately prior to the sale or transfer."

50. As a result of being "Displaced," Mr. Van Cott became entitled to the separation pay and benefits provided for under the terms of the Displacement Program.

51. Defendant has refused to remit to Mr. Van Cott the separation pay and benefits provided for under the terms of the Displacement Program.

52. As such, Mr. Van Cott is entitled under Section 502(a)(1)(B) of ERISA, 29 U.S.C. §1132(a)(1)(B), to recover the separation pay and benefits (or their equivalent value) provided for under the terms of the Displacement Program in an amount no less than $350,000, as well as interest, attorney's fees and costs.

**WHEREFORE,**

A. On the **First Claim for Relief**, a judgment declaring that plaintiff was "Displaced" under the terms of the Displacement Program, together with attorneys' fees, costs and interest thereon, and for such other, further and different relief as may be deemed just and proper by the Court.

B. On the **Second Claim for Relief**, plaintiff demands judgment in an amount no less than $350,000.00, together with attorneys' fees, costs and interest thereon, and for such other, further and different relief as may be deemed just and proper by the Court.

Dated: New York, New York
October 30, 2007

                    HIMMEL & BERNSTEIN, LLP

                    By: _____
                          Tracey S. Bernstein (TB-0405)
                  Attorneys for Plaintiff
                  928 Broadway, Suite 1000
                  New York, NY 10010
                  (212) 631-0200

## CERTIFICATE OF SERVICE

I, Tracey S. Bernstein, hereby certify that on October 30, 2007, I caused the annexed AMENDED COMPLAINT to be served upon defendant's counsel listed below by overnight courier to.

Neil Roslinsky, Esq.<br>
Reed Smith LLP<br>
599 Lexington Avenue<br>
New York, NY 10022

Dated: New York, New York
October 30, 2007

Tracey S. Bernstein (TB 0405)